**HARRIS COUNTY, Texas, Appellant,**

v.

**Frank L. VERNAGALLO, Appellee.**

No. 14–03–00619–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

July 28, 2005.

Rehearing Overruled Dec. 1, 2005.

Lisa Rice Hulsey, Nick Turner, Houston, for appellant.

Anthony Paul Griffin, Galveston, for appellee.

Panel consists of Chief Justice HEDGES and Justices FOWLER and FROST.

**OPINION**

WANDA McKEE FOWLER, Justice.

Harris County appeals the trial court's judgment awarding Frank Vernagallo lost wages and attorney's fees under the Texas Whistleblower Act. In three issues, the County asserts that 1) the evidence is legally and factually insufficient to support the jury's finding that Vernagallo was terminated because he reported alleged illegal conduct; 2) the evidence is legally and factually insufficient to support the jury's finding that Vernagallo made a "good faith" report of alleged illegal conduct on January 15, 1998; and 3) the jury's finding—that the County would not have terminated Vernagallo based solely on information, observation, and evidence unrelated to his report—is against the great weight and preponderance of the evidence. We sustain the County's legal sufficiency challenge to the evidence supporting causation, reverse, and render judgment that Vernagallo take nothing.

**I. Factual Background**

**A. Summary of Vernagallo's Employment with the County.**

Vernagallo began working for the County in 1987 as a reserve deputy before becoming a full-time deputy in 1988. During his service with the County, Vernagallo received commendations and awards from his supervisors and co-workers for performing his job well; these are described in more detail below. However, Vernagallo's employment with the County was punctuated by numerous complaints about

his temper and treatment of fellow officers and citizens, also described more fully below. As a result, on January 8, 1998, the County informed Vernagallo that he would be required to participate in the Employee Assistance Program. Vernagallo also reported alleged illegal conduct on numerous occasions while he was employed with the County. Constable Freeman terminated Vernagallo's employment by letter on the 8th of April, 1998.

**B. Vernagallo's Awards.**

Vernagallo received many awards and commendations during his first few years of employment with the County. In August of 1988, Vernagallo was commended for his professional manner and teamwork, which resulted in an arrest for delivery of a controlled substance. In July of 1989, Vernagallo was congratulated for his part in an operation that resulted in four arrests in a neighborhood that drug dealers were known to frequent. One year later, Vernagallo was again commended for his involvement and professionalism in a felony arrest that resulted in the seizure of 2.5 kilograms of cocaine. In 1991, a private association that contracted for area law enforcement patrols wrote to the department to express their appreciation for Vernagallo's loyalty and dedication to their community. Vernagallo's awards culminated in a 1994 nomination for the "One Hundred Club Award" for his excellent handling of a bank robbery situation.[1]

**C. Complaints About Vernagallo.**

Despite these awards and commendations, Vernagallo's employment with the County was not entirely positive. The complaints about Vernagallo from citizens and fellow officers began in 1990, when a citizen filed a sworn Internal Affairs com-

---

1. Although Vernagallo was nominated for the award in 1994, he did not receive the award

until the 1996 awards banquet.

plaint, alleging that Vernagallo pulled him over while he was driving, cursed at him, and threatened to place him in jail. In 1995, a fellow officer reported that Vernagallo had yelled and cursed at him; numerous other officers witnessed the exchange.

The following year, Vernagallo received his first reprimand about improper handling of evidence: Deputy Phillips advised Vernagallo that he was not allowed to store drug evidence in the desk drawer of court personnel. That same year, Vernagallo's neighbor, Delia Coy, alleged that Vernagallo had been harassing her family, arresting them for minor offenses, and threatening to place them in jail for the past two years. Chief Biehunko counseled Vernagallo about the first complaint by his neighbors. In 1996, Daniel McCool, a deputy sheriff, sent a certified letter complaining that Vernagallo had cursed, threatened, and pushed him at a union meeting. Internal Affairs reviewed these allegations but did not formally investigate because McCool did not provide a sworn account.

The number of complaints about Vernagallo's behavior and treatment of fellow officers and citizens increased dramatically in 1997; at lest six incidents occurred that year. In January, one citizen alleged that Vernagallo had yelled and cursed at him at a gun show. Because the citizen did not provide a sworn affidavit, there was no further follow-up. Another citizen filed an informal Internal Affairs complaint alleging that Vernagallo yelled at, cursed, and threatened her when she questioned Vernagallo's arrest of her son-in-law. Sergeant McFadden counseled Vernagallo about this incident. Vernagallo's neighbors filed another complaint, this time a formal one, about his continued harass-

ment of them. This complaint was not sustained because the Coys' allegations could not be "established conclusively," although Sergeant McFadden noted that he found the circumstances "suspicious."

During the investigation of the second Coy complaint, Sargeant McFadden discovered that Vernagallo, again, was handling and storing evidence improperly. Vernagallo continued to store evidence in a court clerk's desk and had destroyed evidence by flushing it down a toilet. Vernagallo was disciplined for improper handling of narcotics evidence and for failing to obey the previous order relating to his improper storage of evidence.[2]

Two other incidents occurred in November of 1997. Jennifer Lemke, a citizen who operated a towing service, filed an informal complaint alleging that Vernagallo had cursed at her drivers and threatened to arrest them if they did not leave the scene of an accident. Chief Biehunko counseled Vernagallo about this incident. Thomas Johnson, another police officer, filed a sworn, formal complaint just days later. Johnson reported that Vernagallo had pulled him over in his car. Then, Vernagallo yelled at him, cursed him, and threatened him before finally pointing a gun at him. After a formal investigation, the complaint was classified as not sustained because Johnson's allegations could neither be proven nor disproven.

Three other incidents merit discussion as well. These hostile confrontations involved Vernagallo and other law enforcement officers. In the first, Vernagallo yelled at, cursed, and threatened a fellow law enforcement officer at a political party convention. In the second, Vernagallo's supervisor, Corporal Clausen, was called to

---

2. In Sergeant McFadden's opinion, Vernagallo "intentionally turned over more controlled substances [to court personnel rather than the property room custodian] ... after being told not to continue this practice...."

the scene when Vernagallo had a hostile confrontation with a Houston police officer who had stopped Vernagallo while he was driving. In the last incident, Vernagallo pulled over Houston police officer Frank Stumpo. Officer Stumpo stated that Vernagallo yelled at him and cursed him. He also stated he thought Vernagallo would kill him. On each of these last two incidents, Vernagallo's supervisor, Corporal Clausen, counseled Vernagallo at the scene.

### D. Referral to the Employee Assistance Program at the January 8, 1998 Meeting.

Because of all of these incidents, on January 8, 1998, the County placed Vernagallo on probation and required him to participate in an Employee Assistance Program ("EAP") for anger management. Vernagallo's immediate supervisor, Corporal Clausen, and Chief Biehunko were at this meeting. Constable Freeman was not present, although he authored the letter referring Vernagallo to EAP. In this letter, Constable Freeman told Vernagallo that the "number of complaints ... and the nature of the complaints" were of great concern to him. Constable Freeman also warned Vernagallo that he would be "subject to disciplinary action" that could range from "suspension to termination" if his unacceptable behavior continued. When Biehunko informed Vernagallo that he would have to participate in EAP, Biehunko also asked Vernagallo if he had written an anonymous letter that was sent to Mothers Against Drunk Drivers (the

"anonymous letter"), and later forwarded to the District Attorney's office.[3] The letter described the actions of other officers who did not arrest a man who may have been driving while under the influence of alcohol. Vernagallo denied authorship during the meeting but later claimed he had written the letter.

### E. Report of Alleged Illegal Conduct at the January 15, 1998 Meeting.

Days after his referral to EAP, Vernagallo met with the Harris County District Attorney's office to report alleged illegal conduct. This was not Vernagallo's first report of alleged illegal conduct, but it is the report at issue in this appeal. Present at the meeting were Vernagallo, Justice of the Peace George Risner, Assistant District Attorney Chuck Noll and First Assistant to the District Attorney Don Stricklin.[4] Vernagallo reported three incidents of alleged illegal conduct. First, Vernagallo reported that a private citizen made $100 cash gifts to some of the officers, including Vernagallo, in December of 1997. Vernagallo also reported that some officers wrongfully had removed property from South Bend, an abandoned subdivision.[5] Finally, Vernagallo told those present at the meeting that he had authored the anonymous letter about the alleged drunk driver.

Assistant District Attorney Chuck Noll contacted Sergeant McFadden, who is responsible for investigating internal affairs, to investigate the allegations in the anonymous letter about a drunk driver.[6] Ser-

---

3. An attached fax cover page indicated that Harris County Judge Robert Eckels forwarded the anonymous letter to Constable Freeman.

4. The parties sometimes refer to Mr. Stricklin, now the Honorable Don Stricklin of the 337th District Court of Harris County, as "Don Strickland." For simplicity, we refer to him as Don Stricklin.

5. The District Attorney's office previously investigated this incident, but no charges were filed.

6. Sergeant McFadden was also contacted by the District Attorney's office to investigate the allegations of $100 cash gifts to the officers.

geant McFadden conducted an investigation and reported his conclusion by inter-office memo to Constable Freeman. In the inter-office memo, Sergeant McFadden did not identify Vernagallo as the writer of the anonymous letter, nor as the person who alerted the District Attorney's office to the incidents described in the letter. Constable Freeman, who later fired Vernagallo, denied knowing then that it was Vernagallo who made the January 15th report.

### F. Vernagallo's Termination.

The final complaint about Vernagallo occurred just three months later. This time, a fellow officer and a citizen both filed formal Internal Affairs complaints about Vernagallo's behavior. Deputy Coyle witnessed Vernagallo yelling and cursing at two citizens Vernagallo had pulled over in their car. Vernagallo assaulted citizen Compuzano, and threatened citizen Laredo with jail, suggesting that Child Protective Services then would take away her child. Finally, Vernagallo ordered Compuzano to throw what appeared to be marijuana into the gutter.[7]

Following the Internal Affairs investigation, Freeman sent the letter terminating Vernagallo's employment. The letter recited that Vernagallo was being fired for his use of threatening or insulting language toward citizens Laredo and Compuzano, in violation of the Departmental Policy and Ethics Manual (section 12.21). In addition, the letter recited that Vernagallo was being terminated for his improper handling and storage of the possible drug evidence found during the incident with citizens Laredo and Compuzano, in violation of the Departmental Policy and Ethics Manual (General Order # 11). Finally, the letter recited that Vernagallo's behavior at the traffic stop of Laredo and Com-

puzano was "totally unacceptable." Constable Freeman wrote:

> You yelled at and cursed at a female in the presence of her four year old child. You improperly disposed of a suspected controlled substance in the presence of two citizens as well as your trainee deputy, Scott Coyle. As his senior officer, you are supposed to set an example for the trainee, and instruct him in proper procedures. Instead, you acted inappropriately in his presence and you brought discredit to both yourself and this Department.
>
> Once again you have allowed a minor disagreement to escalate into a major confrontation. You are unable to interact with the public and fellow employees when there is a difference of opinion without losing control of your anger.

This behavior violated section 13.2 of the Departmental Policy and Ethics Manual, which provides that, "No employee shall act or behave privately or in any official capacity in such a manner as to bring discredit upon himself or the department."

Constable Freeman testified that he fired Vernagallo because of the incident involving citizens Laredo and Compuzano that Deputy Coyle witnessed. Chief Biehunko testified that any police officer would have been terminated for mistreating citizens and destroying drug evidence. Vernagallo contended the real reason he was fired was for reporting what he believed to be illegal conduct in his January 15th meeting at the District Attorney's office.

## II. Procedural Background

### A. Vernagallo's Whistleblower Suit.

Several months later, Vernagallo filed suit, alleging he was fired in violation of

---

7. At trial, Vernagallo denied that the substance was marijuana.

the Texas Whistleblower Act.[8] The trial court initially dismissed Vernagallo's claim for failing to exhaust the applicable grievance or appeal procedures before filing suit.[9] Vernagallo appealed, and this court reversed and remanded his case for trial.[10] On remand, the parties tried the case to a jury. The jury found in Vernagallo's favor and awarded him $3,000.00 in lost wages. The County filed a motion for new trial, arguing the evidence did not support the jury's causation and good faith findings and urging the trial judge to disregard the jury's finding that Vernagallo would not have been fired for reasons unrelated to his report of alleged illegal conduct. The trial judge denied this motion and, in the second amended final judgment, awarded Vernagallo his lost wages, attorney's fees, as well as pre- and post-judgment interest.[11] The County then brought this appeal.

### B. The County's Issues on Appeal.

On appeal, the County raises three points of error. In two issues, the County argues that the evidence does not support the jury's affirmative finding on Question One. Question One asked the jury,

Was [Vernagallo's] report of January 15, 1998 to the Harris County District Attorney's office made in good faith and a cause of [the] County's terminating [Vernagallo] when it did?

In its first issue, the County asserts that Vernagallo failed to prove that his January 15th report was a cause of his termination. In its second issue, the County asserts that Vernagallo failed to prove he made the report in good faith.

In its third issue, the County asserts the jury's "No" finding on Question Two was against the great weight and preponderance of the evidence. Question Two asked the jury,

Do you find that [the] County would have terminated [Vernagallo] based solely on information, observation, or evidence that is not related to the fact that [Vernagallo] made a report of a violation of law?

The County argues that the jury should have found in its favor on this question, which is classified as an affirmative defense to a suit under the Texas Whistleblower Act.[12]

---

8. Vernagallo originally pleaded a violation of the Texas Labor Code and later amended his pleading to allege a claim under the Texas Whistleblower Act. *See* TEX. GOV'T CODE § 554.001–.010.

9. *See* TEX. GOV'T CODE § 554.006 (requiring employee to initiate action under the grievance or appeal procedures of the employer before suing under this chapter).

10. *Vernagallo v. Freeman*, No. 14–99–00584–CV, 2000 WL 1357206 (Tex.App.-Houston [14th Dist.] Sept. 21, 2000, no pet.) (not designated for publication).

11. *See* TEX. GOV'T CODE § 554.003 (specifying the relief available in a successful claim).

12. TEX. GOV'T CODE § 554.004(b) ("It is an affirmative defense ... that the employing state or local governmental entity would have taken the action against the employee ...

based solely on information, observation, or evidence that is not related to the fact that the employee made a report protected under this chapter of a violation of law."). We note that, despite its characterization in the Government Code as an affirmative defense, proof under this section actually negates the causation element of a whistleblower plaintiff's cause of action. *See Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 212 (Tex.1996) ("An affirmative defense does not seek to defend merely by denying the plaintiff's claims, but rather seeks to establish 'an independent reason why the plaintiff should not recover.' "); *Walzier v. Newton*, 27 S.W.3d 561, 563–64 (Tex.App.-Amarillo 2000, no pet.) (stating that affirmative defenses are interposed to defeat a prima facie case established by the plaintiff, and sole proximate cause was not an affirmative defense because it purported to negate an element of the plaintiff's cause of action); *Buls v. Fuselier*, 55 S.W.3d 204, 211 (Tex.

### III. No evidence supports the jury's finding that the County fired Vernagallo because of his January 15th report.

■ Question One forms the basis of the County's first two issues on appeal. Question One asked the jury about two facts: 1) Was Vernagallo's January 15th report made in good faith; and 2) Was that report a cause of his termination? [13] In its first issue, the County contends the evidence is insufficient, both legally and factually, to prove that Vernagallo's January 15th report was a cause of Vernagallo's termination.[14] In its second issue, the County contends the evidence does not prove Vernagallo made his report in good faith. Because, as we discuss below, the evidence is legally insufficient to prove causation, we do not address the County's remaining issues.

### A. Standard of Review.

App.-Texarkana 2001, no pet.) ("[A]n affirmative defense relieves the defendant of liability even if all the elements of the plaintiff's cause of action are established.") (citing *Moulton v. Alamo Ambulance Serv., Inc.*, 414 S.W.2d 444, 448 (Tex.1967)); *Metrocon Constr. Co., Inc. v. Gregory Constr. Co., Inc.*, 663 S.W.2d 460, 464 (Tex.App.-Dallas 1983, writ ref'd n.r.e.) (on reh'g) ("By an affirmative defense a defendant, rather than denying the existence of the plaintiff's allegations, attempts to avoid the plaintiff's allegations by proving a new, independent fact."). Under the Whistleblower statute, proof that the governmental employer would have made the same decision *solely* because of a reason unrelated to the employee's protected report negates an essential element of the whistleblower plaintiff's case, namely, that the report was a cause of the adverse employment action. If the plaintiff was fired solely for a reason unrelated to his report of illegal activity, then his report could not have been a cause of his termination. And, like two sides of the same coin, if the report was a cause of his termination, the plaintiff could not have been fired *solely* because of an unrelated reason.

■ The Texas Supreme Court recently considered the appropriate standard of review for a legal sufficiency challenge in *City of Keller v. Wilson*, 168 S.W.3d 802 (Tex.2005). As an appellate court, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that supports it. *See id.* at 821–22. The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *See id.* at 827–28. We credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *See id.* The trier of fact is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See id.* at 819–21; *Ulmer v. Ulmer*, 130 S.W.3d 294, 300 (Tex.App.-Houston [14th Dist.] 2004, no pet.) (en banc). We cannot substitute our judgment for that of the jury, so long as the evidence falls within the zone of reasonable disagreement. *See City of Kel-*

13. *See Texas Dep't of Human Servs. v. Hinds*, 904 S.W.2d 629, 636 (Tex.1995) ("[T]he standard of causation in whistleblower and similar cases should be that the employee's protected conduct must be such that, without it, the employer's prohibited conduct would not have occurred when it did.").

14. We address the County's legal sufficiency challenge first. *See Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex.1981) (per curiam); *Mohnke v. Greenwood*, 915 S.W.2d 585, 589 (Tex.App.-Houston [14th Dist.] 1996, no writ) (en banc); *see also City of Houston v. Cotton*, No. 14–03–00637–CV, 2005 WL 646096, *4 (Tex.App.-Houston [14th Dist.] Mar. 22, 2005, no pet. h.) ("When ... both legal and factual sufficiency challenges are raised on appeal, the appellate court must first examine the legal sufficiency of the evidence.") (citing *Trimble v. Tex. Dep't of Protective & Regulatory Servs.*, 981 S.W.2d 211, 217 (Tex.App.-Houston [14th Dist.] 1998, no pet.)).

*ler*, 168 S.W.3d at 821–22. But, "if the evidence allows of only one inference, neither jurors nor the reviewing court may disregard it." *Id.*

**B. Proof by Circumstantial Evidence.**

 In a whistleblower claim, "[c]ircumstantial evidence may be sufficient to establish a causal link between the adverse employment action and the reporting of illegal conduct." *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 69 (Tex.2000) (citing *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex.1996)). Circumstantial evidence in this type of case includes the following:

- knowledge of the report of illegal conduct;
- expression of a negative attitude toward the employee's report of the illegal conduct;
- failure to adhere to established company policies regarding employment decisions;
- discriminatory treatment in comparison to similarly situated employees; and
- evidence that the stated reason for the adverse employment action is false.

*Id.* (citing *Cont'l Coffee*, 937 S.W.2d at 451).

We address each type of circumstantial evidence listed by the *Zimlich* court below to determine whether any evidence supports a finding that Vernagallo's January 15th report was a cause of his termination.

**1. *Zimlich* Type One: Knowledge of the Report.**

 The first type of circumstantial evidence listed by the *Zimlich* court is knowledge of the report of illegal conduct. *Id.* As we explain in greater detail below, to prove that an employee's termination was because of his report of alleged illegal

conduct, the employee must show that the person who made the decision to terminate the employee knew of the employee's report. Our inquiry is further narrowed because the jury was asked specifically about Vernagallo's January 15th report to the District Attorney's office. Thus, we initially determine whose knowledge is relevant, before turning to whether that person knew of Vernagallo's January 15th report.

**a. Constable Freeman must have known of Vernagallo's January 15th report.**

 For a complainant to show causation in a suit alleging wrongful termination under the Whistleblower statute, the complainant must show that the person who took the adverse employment action knew of the employee's report of illegal conduct. *See id.* at 70 (sustaining a legal sufficiency challenge when there was "no evidence in the record . . . that the decision-maker . . . knew about [the employee's] report of . . . illegal conduct") (citing *Cont'l Coffee*, 937 S.W.2d at 451–52); *see also Beattie v. Madison County Sch. Dist.*, 254 F.3d 595, 603–04 (5th Cir.2001) (noting that the school board was the final decision-maker and "if there is no evidence that the board knew of the protected activity," the employee could not show that the activity was the reason she was fired); *City of Forth Worth v. Johnson*, 105 S.W.3d 154, 164 (Tex.App.-Waco 2003, no pet.) ("In particular, the employee must show that the person who ultimately made the decision to fire the employee knew of the reported violation of law made by the employee."). This is because the decision-maker could not fire an employee because of the employee's report of alleged illegal conduct if the decision-maker did not even know the employee made such a report. *See Zimlich*, 29 S.W.3d at 70; *Beattie*, 254 F.3d at 603–04; *Johnson*, 105 S.W.3d at 164.

In this case, Constable Freeman signed the letter from the County terminating Vernagallo. Constable Freeman testified that an elected constable, such as himself, has the authority to hire and fire without consulting any other person or board. Vernagallo has not contested that Constable Freeman was the final decision-maker.[15] Thus, we look to the record for any evidence to support a finding that Constable Freeman knew of Vernangallo's January 15th report. *See id.*

**b. No evidence shows that Constable Freeman knew of Vernagallo's January 15th report.**

We find no direct evidence that Constable Freeman knew of Vernagallo's January 15th report. Vernagallo seems to agree with this conclusion because he relies on circumstantial evidence to prove Constable Freeman had knowledge.[16] However, the events that Vernagallo relies on occurred on January 8th—*before* the report at issue here. Because these events took place before Vernagallo's January 15th meeting, they do not constitute evidence that Freeman knew of Vernagallo's subsequent January 15th report to the District Attorney, as the jury found.

Vernagallo argues that Constable Freeman knew of his January 15th report because Chuck Noll, an assistant District Attorney, asked Sergeant McFadden to investigate the alleged drunk-driving incident.[17] But, as we discuss below, no evidence in the record exists that any of the people present at the meeting told Constable Freeman that Vernagallo was the person who wrote the letter and reported the other two instances of alleged illegal conduct at the January 15th meeting.

**15.** Vernagallo does, however, urge this court to consider the knowledge of other supervisors. In his brief, Vernagallo asserts: "Employment decisions by the County were not made by Freeman alone working in a vacuum. As the Constable, Freeman oversaw the Precinct 2 office, and relied on his first-line supervisors to carry out much of the duties."

No record citation follows, nor have we been able to locate any evidence in the record to support this assertion. Although not specifically stated by Vernagallo, we interpret his argument as one that asks this court to uphold the County's liability under a "conduit" theory.

We decline to do so, in part, because the Texas Supreme Court has not adopted the "conduit" theory, which permits liability when "one supervisor makes a recommendation regarding an employee to another innocent supervisor who acts on that recommendation without conducting any independent judgment." *See Zimlich*, 29 S.W.3d at 70–71 (also stating the court "need not consider ... whether liability can be based on a 'conduit' theory" because there was no evidence that another employee was the conduit for bad motives).

Additionally, as in *Zimlich*, even assuming the viability of the theory, there is no evidence that Constable Freeman decided to fire Vernagallo based upon the recommendation of another supervisor without exercising any independent judgment. *See id.* at 71. Therefore, we consider only Constable Freeman's purported knowledge.

**16.** Vernagallo relies upon the following events that occurred at his January 8th meeting in Chief Biehunko's office to establish knowledge. At this meeting, Vernagallo was shown the anonymous letter and asked if he had written it. Vernagallo denied writing the letter. According to Vernagallo's testimony, he was then handed the letter referring him to the EAP program along with a fax cover sheet from Judge Eckels addressed to Constable Freeman. Vernagallo later admitted to Biehunko that he had written the letter and, according to Vernagallo's testimony, Biehunko then responded, "I know." Chief Biehunko denied that this exchange occurred.

**17.** The specifics of this incident were detailed in the anonymous letter that Vernagallo claimed he had authored during his January 15th meeting at the District Attorney's office. Sergeant McFadden was also asked to investigate the $100 cash gifts to police officers that Vernagallo reported.

The following people were present at the January 15th meeting and testified at trial. Justice of the Peace George Risner testified that he did not inform Constable Freeman (nor any of Vernagallo's other supervisors) about Vernagallo's complaints. Assistant District Attorney Chuck Noll also testified that he did not remember talking to anyone at the precinct about Vernagallo's report on January 15th. Don Stricklin was also present at the meeting. Portions of his deposition testimony were admitted into evidence, but they do not indicate that he ever informed Constable Freeman that Vernagallo was the person who made the report. Vernagallo also testified that he never told Constable Freeman (or Chief Biehunko or Sergeant McFadden) that he had gone to the District Attorney's office that day. The evidence also does not support a finding that Constable Freeman discovered some other way that Vernagallo reported these incidents.

To conclude, as the jury did, that Constable Freeman knew Vernagallo submitted the January 15th report requires speculation because the record does not divulge if he knew about it. *See id.* ("But absent evidence supporting an inference that discrimination was a factor . . . a finding of liability rests only on speculation."); *see also City of Keller,* 168 S.W.3d at 813 ("In claims or defenses supported only by meager circumstantial evidence, the evidence does not rise above a scintilla (and thus is legally insufficient) if jurors would have to guess whether a vital fact exists."). Constable Freeman may have suspected Vernagallo was the person who reported these incidents to the District Attorney's office. Or, Constable Freeman may not have known, as he testified. The circumstances Vernagallo relies upon—that Assistant District Attorney Chuck Noll contacted Sergeant McFadden to investigate the incident reported in the anonymous letter

and the cash gifts—are "equally consistent with either of [the] two facts." *See Cont'l Coffee,* 937 S.W.2d at 450 (citing *Litton Indus. Prods., Inc. v. Gammage,* 668 S.W.2d 319, 324 (Tex.1984)). In such a case, "no more than a scintilla of evidence supports a finding and a 'no evidence' point must be sustained." *Id.* (citing *Gammage,* 668 S.W.2d at 324).

■ Vernagallo also urges this court to uphold the jury's finding to Question One if the County had knowledge of *any* of Vernagallo's reports. However, we cannot expand our scope of review to consider issues not presented to the jury, and the jury was not asked about any of Vernagallo's other reports. *See Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001).

### 2. *Zimlich* Type Two: Expression of a Negative Attitude.

The second type of circumstantial evidence listed by the *Zimlich* court is the expression of a negative attitude toward the report of alleged illegal conduct. *See Zimlich,* 29 S.W.3d at 69. Vernagallo claims he presented evidence of a negative attitude toward his report of alleged illegal conduct. However, despite Vernagallo's assertion that the record contains each of the types of circumstantial evidence listed by the *Zimlich* court and discussed *supra,* Vernagallo does not identify any record evidence, nor have we found any, to support a finding that Freeman expressed a negative attitude toward Vernagallo's January 15th report. *See id.*

■ The only evidence of a "negative attitude" toward reporting that Vernagallo cites in his brief deals with the cash gifts given to police officers. When Vernagallo asked about the gifts at work, his supervisor, Corporal Clausen, told Vernagallo that "everyone's been getting the money," and later stated that, "if you locked up all the corrupt MFs in this department, [then the

dispatcher] would be talking to herself on the radio."

This testimony does not support the jury's finding for three reasons. First, Constable Freeman—the decision-maker—is not the person who expressed a negative attitude. Second, while we could fairly regard these statements as the expression of a negative attitude toward reporting in general, these statements were made on January 8th, *before* Vernagallo's January 15th report. As such, they could not have been an expression of a negative attitude toward the January 15th report that is the basis of this appeal. Third, even if we attributed the statements to the later January 15th report *and* to Constable Freeman, the expression of a negative attitude toward a report, standing alone, cannot support the jury's finding. *See id.* ("But evidence that an adverse employment action was preceded by a superior's negative attitude toward an employee's report of illegal conduct is not enough, standing alone, to show a causal connection between the two events. There must be more.").

### 3. *Zimlich* Types Three and Four: Failure to Adhere To Established Policies and Discriminatory Treatment.

The third type of circumstantial evidence listed by the *Zimlich* court is the failure to adhere to established policies regarding employment decisions; the fourth is discriminatory treatment in comparison to similarly-situated employees. *See id.* In his brief, Vernagallo asserts that the County failed to adhere to established policies regarding employment decisions and treated Vernagallo differently than similarly-situated employees. Vernagallo cites the County's use of unverified and unsustained complaints against him to establish the required causal link between his January 15th report and his termination.[18] However, Vernagallo does not point to any evidence in the record to support these assertions. The complaints were not sustained because the complaints "were not proven, however the complaints were also not disproved."[19] Constable Freeman's letter to Vernagallo stated that Vernagallo's violations of the Departmental Policy and Ethics Manual were the reason for his termination. Vernagallo has not identified, nor have we located record evidence of, a similarly-situated employee who was treated differently. The same is true of Vernagallo's assertion that the County's actions violated its own established procedures.

### 4. *Zimlich* Type Five: Evidence the Stated Reason for Termination Was False.

 The final type of circumstantial evidence listed by the *Zimlich* court is evidence the stated reason for termination was false. *See id.* As with the previous categories, Vernagallo asserts in his briefing that the stated reason for his termination was false. Again, however, Vernagallo does not cite any evidence in the record, and we have found none, to support this claim. And, as evidenced by the multitude of similar complaints about Ver-

---

18. On appeal, Vernagallo also urges this court to uphold the jury's finding based upon his referral to EAP and his reassignment to building security and desk duties, which he asserts were other adverse employment actions. The jury was not asked, however, whether these decisions were caused by Vernagallo's report. Therefore, we do not consider them. *See Bradford,* 48 S.W.3d at 754 ("Because [appellants] did not object to the jury charge, we review the sufficiency of the evidence in light of the charge submitted.").

19. Sergeant McFadden, who was in charge of internal affairs, testified that when a complaint was "not sustained," it meant the department could not determine "whether [the complained-of activity was] lawful or unlawful or a violation of policy or not."

nangallo's behavior mentioned previously, Constable Freeman's stated reason for firing Vernagallo is not implausible.[20] *See City of Keller,* 168 S.W.3d at 818 ("In discrimination cases, discharged employees will never have to prove that the reason given for termination was a pretext if no-evidence review must disregard [the stated] reason."). Without any evidence, the jury could only speculate that the stated reason for Vernagallo's termination was false. *See Zimlich,* 29 S.W.3d at 70 ("[A]bsent evidence supporting an inference . . . a finding of liability rests only on speculation."); *City of Keller,* 168 S.W.3d at 813 (stating evidence is legally insufficient if the evidence does not rise above a scintilla and jurors could only guess whether a vital fact exists).

Thus, the record does not contain any of the types of circumstantial evidence listed by the *Zimlich* court to show that the County fired Vernagallo because of his January 15th report. Nor does the record contain any direct evidence to prove that fact. We conclude the evidence is legally insufficient to support the jury's answer to Question One, which asked whether Vernagallo's January 15th report was made in good faith and a cause of his termination, and sustain the County's first point of error.

Because we have sustained the County's legal sufficiency challenge to the evidence supporting causation, we do not address its factual sufficiency challenge to causation. *See El Paso Prod. Co. v. Valence Operat-* *ing Co.,* 112 S.W.3d 616, 625 (Tex.App.-Houston [1st Dist.] 2003, pet. denied) (sustaining legal sufficiency challenge and not addressing factual sufficiency challenge); *In re C.O.,* 65 S.W.3d 175, 183 (Tex.App.-Tyler 2001, no pet.) (same); *Houston Mercantile Exch. Corp. v. Dailey Petroleum Corp.,* 930 S.W.2d 242, 248 (Tex.App.-Houston [14th Dist.] 1996, no writ) (same). For similar reasons, we also need not address Question Two, which presented the County's affirmative defense and was predicated on an affirmative answer to Question One (Vernagallo's whistleblower cause of action). The affirmative defense question was relevant and needed to be submitted to the jury only if Venagallo first proved his claim. Because we already have held that Vernagallo did not prove his claim, the question is moot.

## IV. Conclusion

We have reviewed the record and found no evidence to support the jury's finding that the County terminated Vernagallo's employment because of his January 15th report to the District Attorney's office. Thus, we reverse the trial court's judgment, and we render judgment that Vernagallo take nothing on his claims.

---

**20.** Constable Freeman testified that he fired Vernagallo because of the incident involving citizens Laredo and Compuzano that Deputy Coyle witnessed. Chief Biehunko testified that any police officer would have been termi- nated for mistreating citizens and destroying drug evidence.